**Rossi FOTI and David Larsen,**
**Plaintiffs–Appellants,**

v.

**CITY OF MENLO PARK,**
**Defendant–Appellee.**

No. 97–16061.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1997.

Decided May 1, 1998.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc July 29, 1998.

Michael Millen, San Jose, California, Catherine W. Short, Life Legal Defense Foundation, Napa, California, for plaintiffs-appellants.

Kathleen M. Sullivan, John L. Flegel, Jorgenson, Siegel, McClure & Flegel, Menlo Park, California, for defendant-appellee.

Before: BROWNING, PREGERSON, and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Rossi Foti ("Foti") and David Larsen ("Larsen") regularly picket and leaflet on a public sidewalk in the City of Menlo Park ("City") in front of a Planned Parenthood facility. They challenge the constitutionality of Menlo Park Ordinance No. 877, which regulates picketing, leafletting, and posting or displaying signs on public property. The district court denied their motion for a preliminary injunction, and this appeal followed. We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we reverse in part and affirm in part.

## BACKGROUND

Foti and Larsen carry out their picketing on a public sidewalk in Menlo Park several times a week. The sidewalk borders a four-lane arterial roadway that accommodates approximately 23,000 cars per day. When Foti and Larsen first began their protest, they carried signs as large as three feet by five feet. Some of these signs bore pictures of aborted fetuses; others displayed anti-abortion messages. In addition to carrying these signs, Foti and Larsen also placed numerous signs around a public bus stop bench and attached as many as fourteen signs on Foti's car, which was legally parked in the street. Foti and Larsen's other activities included leafletting and discussing abortion issues with passersby.

In response to numerous citizen complaints about these protests, the City adopted Emergency Ordinance No. 876 and its successor Ordinance No. 877.[1] The ordi-

---

**1.** There is no doubt that the City passed these ordinances in response to Foti and Larsen's activities or that the City specifically sought to restrict their protests. Section 1 of the emergency ordinance states:

Certain individuals have been causing a disturbance and creating a disruption of the public peace and health and safety within the City of Menlo Park by demonstrating in front of a facility with very large graphic signs that ... have interfered with the use of the side walk, bus stop, and pedestrian and vehicular traffic. Whether the statute was based on an "alleged illicit legislative motive," however, does not affect our determination of whether the statute was enacted to suppress the content of speech or just its secondary effects. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct.

nance bans the posting of signs on public property or the displaying of signs in the public right-of-way.[2] The ordinance contains several exemptions.[3] There are exemptions for temporary "open house" real estate signs, signs placed by government entities, and safety, traffic, and public informational signs. Other provisions exempt signs on vehicles that are not parked to attract attention and picket signs. The exemption for picketing imposes further requirements: each picketer is limited to carrying a single sign no larger than three square feet, and the picketer must actually move while carrying the sign.

Foti and Larsen have continued their protests, mostly in compliance with the ordinance. They have also added crosses, American flags, and plastic babies to their demonstrations—props which the City concedes do not violate the ordinance. Foti was cited under the emergency ordinance for carrying a sign larger than three square feet, and his sign was confiscated. Foti also alleges that a police officer threatened to confiscate Foti's car if he placed any signs on it at the protest site.

■ Foti and Larsen filed this civil rights action, seeking declaratory and injunctive relief and alleging that the ordinance violated their free speech rights "on-its-face" and "as-applied."[4] The district court denied their application for a temporary restraining order. Foti and Larsen then moved for a preliminary injunction, which was denied. The district court found that the ordinance, although presenting serious constitutional questions, was facially constitutional. The district court also ruled that the plaintiffs had presented inadequate evidence of discriminatory enforcement of the ordinance to establish the unconstitutionality of the ordinance as applied.

## ANALYSIS

■ To succeed on this interlocutory appeal, Foti and Larsen must show a likelihood of success on the merits and the possibility of irreparable injury if denied the injunction or the existence of serious questions going to the merits and the balance of hardships tipping in their favor. *See Gilder v. PGA Tour*, 936 F.2d 417, 422 (9th Cir.1991). Although we review a district court's decision to deny a motion for a preliminary injunction for an abuse of discretion, *see San Antonio Community Hosp. v. Southern Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1233 (9th Cir.

---

925, 928–29, 89 L.Ed.2d 29 (1986) (quoting *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968)).

2. Section 844.030(1) states:

No sign may be posted, attached, painted, marked or written on, or otherwise affixed to or placed upon public property or displayed in the public right-of-way. As used herein, "public property" includes, but is not limited to: highways, streets, roadways, crosswalks, curbs, curbstones, sidewalks, utility poles or boxes, hydrants, street lights, public buildings and structures, parks, recreation areas or other landscaped grounds owned or maintained by a public agency.

3. Section 8.44.020(3) provides:

Nothing in this chapter shall apply to:

. . . . .

(b) Signs on vehicles of any kind, provided:
(1) The vehicle is not *parked* in order to display, demonstrate, advertise, or attract the attention of the public, and
(2) Such signs are not otherwise in violation of California Vehicle Code § 26708.
(c) Two temporary "open house" real estate signs, each not exceeding four square feet in area, referring to any one open house event.

(d) Signs installed, maintained, erected or placed on public property by government entities.

(e) Safety, traffic, or other public informational signals, signs, banners or notices erected or maintained by a public officer or employee in performance of a public duty or by a contractor, utility company or other persons responsible for public safety, peace and welfare.

(f) A single sign carried by an otherwise lawfully present person, provided:
(1) The sign being carried does not exceed three square feet in area, and
(2) The person carrying such a sign is actually moving, and not remaining stationed in one position.

4. The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech. . . ." The Fourteenth Amendment makes this limitation applicable to the States, *see Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and to their political subdivisions, *see Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

1997), we review the legal issues underlying the district court's decision de novo, *see Crawford v. Lungren*, 96 F.3d 380, 384 (9th Cir.1996).

## A

■■■ At the outset, we address some apparent confusion regarding the meaning of a "facial" and an "as-applied" constitutional challenge. An ordinance may be facially unconstitutional in one of two ways: "either [ ] it is unconstitutional in every conceivable application, or [ ] it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984). In the first type of facial challenge, the plaintiff argues that the ordinance could never be applied in a valid manner because it is unconstitutionally vague or it impermissibly restricts a protected activity. *See N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir.1984). In such a case, the litigant has standing to vindicate his own constitutional rights. *See Vincent*, 466 U.S. at 796, 104 S.Ct. at 2124. The second type of facial challenge is an exception to our general standing requirements: the plaintiff argues that the statute is written so broadly that it may inhibit the constitutionally protected speech of third parties, even if his own speech may be prohibited. *See id.* at 797, 104 S.Ct. at 2124–25. A successful challenge to the facial constitutionality of a law invalidates the law itself.

■■■ An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others. *See id.* at 803 & n. 22, 104 S.Ct. at 2127–28 & n. 22. An as-applied challenge does not implicate the enforcement of the law against third parties. Rather, a litigant may separately argue that discriminatory enforcement of a speech restriction amounts to viewpoint discrimination in violation of the First Amendment. *See I.N.S. v.*

*Federal Labor Relations Auth.*, 855 F.2d 1454, 1467 (9th Cir.1988). As-applied challenges are the most common type of challenges to restrictions on speech activity and may be coupled with facial challenges. *See, e.g., City of Richmond*, 743 F.2d at 1352. A successful as-applied challenge does not render the law itself invalid but only the particular application of the law.

Here, Foti and Larsen bring the first type of facial challenge—any enforcement of the ordinance creates an unacceptable risk of the suppression of ideas—and an as-applied challenge to Ordinance No. 877. Inadequate evidence of the City's alleged discriminatory enforcement of the ordinance does not defeat their as-applied challenge. Thus, we consider both the facial constitutionality of the ordinance as well as its constitutionality as applied to their activities.

## B

■■■ Public streets and sidewalks are "the archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988).[5] Regulation of speech in a traditional public forum "is subject to the highest scrutiny." *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 2705 (1992). The appropriate level of scrutiny is tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content. *See Frisby*, 487 U.S. at 481, 108 S.Ct. at 2500–01.

> For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The State may also enforce regulations of time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

---

**5.** Menlo Park's ordinance bans signs on all public property. Parks are quintessential public fora, *see Hague v. Committee for Indus. Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939), while utility poles and lampposts are not, *see Vincent*, 466 U.S. at 815, 104 S.Ct. at 2134.

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (citation omitted). Also, a content-based regulation of constitutionally protected speech must use the least restrictive means to further the articulated interest. *See Sable Communs. of California v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989).

 It is undisputed that Foti and Larsen's speech activity is constitutionally protected. *See Frisby*, 487 U.S. at 479, 108 S.Ct. at 2499–2500 (public issue picketing); *Vincent*, 466 U.S. at 803, 104 S.Ct. at 2127–28 (signs); *Schneider v. State*, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) (leafletting).[6] Thus, our principal inquiry is whether the government has adopted a regulation of speech "without reference to the content of the regulated speech." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593 (1994) (internal quotations omitted).

### 1

 "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 643, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). At first blush, Menlo Park's ordinance appears to be content-neutral; after all, it bans *all* signs on *all* public property. But when "exceptions to the restriction on noncommercial speech are based on content, the restriction itself is based on content." *National Advertising Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir.1988).

Here, the exemptions for "open house" real estate signs and safety, traffic, and public informational signs are content-based. *See* Menlo Park Municipal Code §§ 8.44.020(3)(c), (e). To enforce the ordinance, a law enforcement officer must "examine the content of … signs to determine whether the exemption applies." *Desert Outdoor Advertising v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996) (applying content-based test to exemptions for official notices, directional, warning, or information structures, public utility signs, and structures erected near a city or county boundary which contain the name of the city, county, or civic, fraternal, or religious organizations located therein); *National Advertising*, 861 F.2d at 248 (applying content-based test to exemptions for memorial tablets or plaques, real estate and construction signs, open house signs, and traffic and safety signs).

 The City attempts to distinguish *Desert Outdoor Advertising* and *National Advertising* by arguing that Menlo Park's ordinance applies only to public property while the ordinances at issue in those cases regulated billboards on public and private property. We determine, however, whether a regulation is content-based or content-neutral in the first instance, without regard to the scope of the statute. Menlo Park's exemptions for open house signs and safety, traffic, and public informational signs are content-based because a law enforcement officer must read a sign's message to determine if the sign is exempted from the ordinance.[7]

---

**6.** Other forms of expressive conduct not at issue in Foti and Larsen's as-applied challenge are implicated in their facial challenge to the ordinance. Expressive conduct like marching in a parade is constitutionally protected speech. *See Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 568, 115 S.Ct. 2338, 2344–45, 132 L.Ed.2d 487 (1995).

**7.** In *City of Ladue v. Gilleo*, 512 U.S. 43, 46–47, 114 S.Ct. 2038, 2040–41, 129 L.Ed.2d 36 (1994), the Supreme Court considered the constitutionality of an ordinance that banned any signs on private property but exempted road and driveway signs, health inspection signs, signs for churches, religious institutions, and schools, identification signs for non-profit organizations

and public transportation stops, real estate sale or rental signs, and commercial signs. Justice O'Connor noted:

> [I]t is quite true that regulations are occasionally struck down because of their content-based nature, even though common sense may suggest that they are entirely reasonable. The content distinctions present in this ordinance may, to some, be a good example of this. But though our rule has flaws, it has substantial merit as well.... [I]t reflects important insights into the meaning of the free speech principle—for instance, that content-based speech restrictions are especially likely to be improper attempts to value some forms of speech over others, or are particularly suscep-

▮▮▮▮▮ Content-based regulations are presumptively unconstitutional. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542–43, 120 L.Ed.2d 305 (1992). The City's content-based exemptions may pass constitutional muster only if they are the least restrictive means to further a compelling interest. *See Sable Communs.,* 492 U.S. at 126, 109 S.Ct. at 2836–37. The City's asserted interests in the ordinance are the oft-invoked and well-worn interests of preventing visual blight and promoting traffic and pedestrian safety.[8] The City argues that the exemptions for open house signs and safety, traffic, or public informational signs also further its interest in traffic safety.

▮▮▮▮ Cities do "have a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter . . . [and] in assuring safe and convenient circulation on their streets." *See One World One Family Now v. City and County of Honolulu,* 76 F.3d 1009, 1013 (9th Cir.1996) (internal quotation and citations omitted). These substantial interests, however, may not be compelling. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 520, 101 S.Ct. 2882, 2899, 69 L.Ed.2d 800 (1981) (plurality opinion); *National Advertising,* 861 F.2d at 249. Because the City has assumed before the district court and on appeal that the content-neutral test would apply, it has not proffered any reasons why its interests in aesthetics and traffic safety are compelling. Of course, it is difficult to imagine that the

City would not have a compelling interest in traffic signs, for example, which may be developed, or conceded, in further proceedings. However, on the record before us, we find that Foti and Larsen are likely to succeed on the merits of this claim because the content-based exemptions are facially unconstitutional.

2

▮▮▮▮ Like the district court, we are troubled by the wholesale exemption for government speech. *See* Menlo Park Municipal Code § 8.44.020(3)(d). The district court asked for additional briefing on whether this exemption was content-based under a First Amendment analysis or speaker-based under an Equal Protection analysis. Specifically, the district court questioned whether *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972) and *Carey v. Brown,* 447 U.S. 455, 462–63, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980), applied because those Equal Protection cases involved discrimination on the basis of speaker *and* content. The district court also noted that it needed fuller explanations of the City's justifications for the wholesale government exemption. When Foti and Larsen failed to submit additional briefing, the district court ruled that they waived their right to a preliminary injunction based on an Equal Protection argument.[9]

---

tible to being used by the government to distort public debate.
*Id.* at 60, 114 S.Ct. at 2048 (O'Connor, J., concurring) (internal citations omitted).

Although Menlo Park's exemptions for open house signs and safety, traffic, and informational signs seem innocuous, we base our content-based determination on whether the ordinance singles out certain speech for differential treatment based on the idea expressed. The reasonableness, harmlessness, or worthiness of the idea is irrelevant. *See Hurley,* 515 U.S. at 579, 115 S.Ct. at 2350 (1995).

8. It would be difficult to list all the reported cases in which the government sought to justify its ban on expression with the interests of aesthetics and traffic safety. Here are just a few: *City of Ladue,* 512 U.S. at 47, 114 S.Ct. at 2041; *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 511–12, 101 S.Ct. 2882, 2894–95, 69 L.Ed.2d 800 (1981) (plurality opinion); *Ackerley Communs. of*

*Northwest, Inc. v. Krochalis,* 108 F.3d 1095, 1097 (9th Cir.1997); *Outdoor Sys., Inc. v. City of Mesa,* 997 F.2d 604, 611 (9th Cir.1993); *National Advertising,* 861 F.2d 246, 248 (9th Cir.1988); *Baldwin v. Redwood City,* 540 F.2d 1360, 1370 (9th Cir.1976).

We are mindful of Justice Brennan's concern that "[t]he asserted interest in aesthetics may be only a facade for content-based suppression." *Vincent,* 466 U.S. at 822, 104 S.Ct. at 2138 (Brennan, J., dissenting). "[T]he inherent subjectivity of aesthetic judgments makes it all too easy for the government to fashion its justification for a law in a manner that impairs the ability of a reviewing court meaningfully to make the required inquiries." *Id.*

9. The district court also ruled that its order did not preclude Foti and Larsen from renewing their arguments in a summary judgment motion or at trial.

Generally, we do not "consider an issue not passed upon below." *Golden Gate Hotel Ass'n v. City and County of San Francisco,* 18 F.3d 1482, 1487 (9th Cir.1994) (internal quotation omitted). This general rule has exceptions, but invocation of those exceptions is discretionary. *See id.* We choose not to exercise our discretion to consider the merits of this claim. Because Foti and Larsen failed to present complete arguments regarding this exemption to the district court, we affirm the district court's order.

3

A speech restriction is content-neutral if it is "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). As the exemption for signs on parked vehicles merely regulates the time, place, or manner of speech, we apply the content-neutral test.

The exemption pertaining to signs on vehicles is, quite frankly, somewhat odd. *See* Menlo Park Municipal Code § 8.44.020(3)(b). The ordinance exempts from the ban those signs on vehicles "provided [t]he vehicle is not *parked* in order to ... attract the attention of the public ...." (emphasis in original). This exception-within-an-exception really means that the ordinance prohibits signs on vehicles that *are* parked to attract attention. For our purposes, we will consider this "exemption" a ban.

Even odder is the target of this ban. The ordinance does not prohibit signs on parked vehicles; it does not even prohibit signs on parked vehicles that were placed on the car to attract attention. Rather, the target of the ban appears to be the driver's subjective intent. If the driver intends to demonstrate or attract attention with a sign when parking a vehicle, the sign is banned. If the driver

intends to demonstrate or attract attention with a sign when placing the sign on a vehicle but not when parking, the sign is permitted. Thus, to enforce the ordinance, a Menlo Park law enforcement officer must decipher the driver's subjective intent to communicate from the positioning of tires and the chosen parking spot.

Although creative, this ban runs afoul of the First Amendment in two important respects. First, it is unconstitutionally vague.[10] "A fundamental requirement of due process is that a statute must clearly delineate the conduct it proscribes." *Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1057 (9th Cir.1986) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)). A statute must be sufficiently clear so as to allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99; *see United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir.1996). Statutes that are insufficiently clear are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms. *Grayned,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99. Moreover, when First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required. *See N.A.A.C.P. v. Button,* 371 U.S. 415, 432–33, 83 S.Ct. 328, 337–38, 9 L.Ed.2d 405 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.... Because First Amendment freedoms need breathing space to survive, government may regulate in

**10.** Contrary to the City's assertion at oral argument, we are not confined to examining the vagueness of the ordinance only as applied to Foti and Larsen's activities. A facial challenge is permissible when the statute in question clearly implicates free speech rights. *See United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir.1996); *see also Chapman v. United States,* 500 U.S. 453, 467, 111 S.Ct. 1919, 1928–29, 114 L.Ed.2d 524 (1991) ("First Amendment freedoms are not in-

fringed by [the statute], so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362 (1982) ("Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.") (internal quotation and citations omitted).

the area only with narrow specificity."); *Kev*, 793 F.2d at 1057.

Menlo Park's ban falls squarely into that class of statutes that "impermissibly delegates basic policy matters to police[ ] . . . for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99. A Menlo Park police officer attempting to enforce this ban must evaluate a myriad of factors: the driver's choice of a prominent or obscure parking space; the amount of vehicular and pedestrian traffic around the chosen parking space; the presence of any other vehicles, trees, shrubs, or buildings that block the views of passersby; the size, color, design, and shape of the signs; and the placement of the signs on the car. With this range of factors to consider, there is the danger that a police officer might resort to enforcing the ordinance only against cars with signs whose messages the officer or the public dislikes. We recognize that we must read a statute with "flexibility and reasonable breadth," not "meticulous specificity." *Grayned*, 408 U.S. at 110, 92 S.Ct. at 2299–2300 (internal quotation and citation omitted). But given the gaps in this ordinance and Menlo Park having obviously adopted the ordinance to specifically target Foti and Larsen's activities, we conclude that Ordinance No. 877 is "so imprecise that discriminatory enforcement is a real possibility." *Wunsch*, 84 F.3d at 1119.

■ The City argues that, in fulfilling our duty to fairly interpret a statute in a manner that renders it constitutionally valid, we should read the ordinance to apply only to "temporary" signs. *See Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 611 (9th Cir. 1993); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982) ("In evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a[n] . . . enforcement agency has proffered."). This reading, the city contends, removes the vagueness in the ordinance.

■ Although we must consider the City's limiting construction of the ordinance, we are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance. *See National Advertising*, 861 F.2d at 247 (refusing to limit ordinance's ban to off-site commercial signs when plain language of ordinance applied to all speech in off-site signs). The plain language of Menlo Park's ban applies to all signs on vehicles, not just temporary signs. Moreover, the insertion of "temporary" into the ordinance does not solve its vagueness problem. Again, the target of the ban is the subjective intent of the driver to communicate when parking a vehicle, not the presence of temporary or permanent signs. A police officer would still be required to decipher the driver's motivation in parking a vehicle that displays a temporary sign.

■ Menlo Park's ban on signs on parked cars offends the First Amendment in a second fundamental way. As the City has continuously stressed, the ban only applies to those signs on parked cars designed to function as a billboard. It does not apply to signs on parked cars when there is no intent to use the vehicle as a billboard. The ordinance thus bans purposeful speech and permits incidental speech.

■ This reasoning turns the First Amendment on its head. It is well-established that the First Amendment affords the greatest protection to purposeful speech while allowing more regulation of incidental speech. *Compare United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673 (1968) (applying "intermediate scrutiny" to statute prohibiting conduct but incidentally restricting free speech), *with United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (applying "strict scrutiny" to statute specifically prohibiting various forms of free speech activities in a public forum). Government can assert no substantial interest in suppressing speech when the speaker intends to communicate but permitting the same speech if incidental to another activity.

Also, "[e]xemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: they may diminish the credibili-

ty of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo,* 512 U.S. 43, 52, 114 S.Ct. 2038, 2044, 129 L.Ed.2d 36 (1994). Here, the exemption from Menlo Park's ban on signs on parked cars demonstrates that the City has concluded that its interest in allowing signs on cars that are not parked to attract attention outweighs its aesthetic and traffic safety interests. It is difficult to understand why signs on parked cars will create traffic hazards and cause visual blight only if the driver subjectively intends to communicate when parking the vehicle.[11] Thus, the ordinance is facially unconstitutional because it targets those persons engaged in the core of First Amendment activity and is not supported by any valid government interest.

4

The ordinance's content-neutral regulation of picketing controls the size and number of signs and manner of picketing. *See* Menlo Park Municipal Code § 8.44.020(3)(f). The City asserts that the regulation is designed to advance the City's interests in keeping sidewalks clear and preventing visual clutter. Foti and Larsen, arguing that such interests are not valid reasons to justify restrictions on picketing on public sidewalks, would have us hold the regulation of picketing to a higher standard than other forms of expressive conduct.

■ We decline to craft such a standard. "[P]icketing and parading ... is subject to regulation even though intertwined with expression and association." *Cox v. Louisiana,* 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965). In *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), the Supreme Court upheld a statute that prohibited picketing "in such a *manner* as to obstruct or unreasonably interfere with free ingress or egress" to public premises or with free use of public sidewalks. *See id.* at 612 n. 1, 617, 88 S.Ct.

at 1336 n. 1, 1338–39 (emphasis added). In *Grace,* the Supreme Court struck down a total ban on public sidewalk picketing around the Supreme Court building but noted that those sidewalks were still subject to reasonable time, place, and manner restrictions. 461 U.S. at 181, 183–84, 103 S.Ct. at 1709, 1710–11. Thus, picketing may be regulated by government and is subject to the same content-based and content-neutral tests that apply to other forms of expressive activity.

■ First, we address the ordinance's restriction on the size and number of signs carried by a picketer. We have upheld restrictions on the size and aggregate area of signs posted on private property based on a city's interests in aesthetics. *See Verrilli v. City of Concord,* 548 F.2d 262, 265 (9th Cir. 1977); *Baldwin v. Redwood City,* 540 F.2d 1360, 1369 (9th Cir.1976); *see also City of Ladue,* 512 U.S. at 48, 114 S.Ct. at 2041–42 (government may regulate the physical characteristics of signs). These cases do not provide a perfect analogy to the issue before us: whether a restriction on the size and number of signs carried by protesters in a traditional public forum may be justified by a city's interest in reducing visual blight. There are obvious differences between a sign posted and left unattended for several weeks and a picket sign carried by a protestor. *See Vincent,* 466 U.S. at 809, 104 S.Ct. at 2131 (dozens of temporary signs posted on utility poles that remain unattended until removed); *Baldwin,* 540 F.2d at 1369 (effects of wind and other weather elements on unreinforced signs posted on pole or lot). While we question whether a regulation of picketing could be justified based solely on a city's interest in aesthetics, we need not resolve that issue here. The City also properly justifies its picketing restriction based on its substantial interest in traffic safety.

*Picketers generally use a public sidewalk to conduct their protest. At the same time,*

---

11. Notably, the only reported accident causally related to Foti and Larsen's picketing activities occurred *after* the ordinance was passed. A driver noticed that Foti's station wagon, parked in front of the clinic, was decorated "with various objects, including an American flag, and what I believed to be a sign or poster." The driver

admits that she took her eyes off the road, "turned back" to look at the station wagon, and then rear-ended a truck in front of her.

It does not appear that the City can blame the sign, instead of the flag, for creating a distraction for the driver. And obviously, reasonable driving care could have prevented this accident.

pedestrians must use the public sidewalk to get around the city. Additionally, when a sidewalk borders a busy street as here, city traffic may be affected by a picket on a public sidewalk. For example, Foti and Larsen demonstrate within several yards of a bus stop. A bus must pull to the side of the street, allow passengers to board and disembark, and safely merge with oncoming traffic. Extremely large or numerous picket signs nearby could well interfere with a bus's operation or with pedestrian circulation on the sidewalk. Therefore, Menlo Park has, on these facts, demonstrated a substantial interest in traffic safety by regulating the size and number of picket signs.

At this early stage in the litigation, we find that the City's picketing regulation is narrowly tailored. The City's restrictions on the size and number of signs serve the City's interest in traffic safety, which "would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (internal quotation omitted). While each restriction may diminish the amount of speech that Foti and Larsen individually may make on the abortion issue, they do not "reduc[e] the total quantum of speech on a public issue." *Meyer v. Grant*, 486 U.S. 414, 423, 108 S.Ct. 1886, 1892, 100 L.Ed.2d 425 (1988) (prohibition against paying circulators of initiative petitions unconstitutionally limited the number of persons who convey a message and size of audience to be reached); *see Baldwin*, 540 F.2d at 1369 (regulation of sign size remotely affected quantity of speech and did not significantly restrict total exposure of political candidate). The restrictions on the size and number of picket signs are reasonable legislative judgments in light of the City's concern for traffic safety. A fifteen square foot sign carried by a protester on a public sidewalk, when compared to a three square foot sign, may block drivers' views of road signs and traffic conditions, intimidate pedestrians, and obstruct the safe and convenient circulation of pedestrians on the sidewalk. Numerous signs propped against a bus stop or carried by one person on the sidewalk may impede pedestrian flow or create a safety hazard. Menlo Park's size and number restrictions are "not

substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 800, 109 S.Ct. at 2758.

Menlo Park's regulation also leaves open ample alternative channels of communication. Foti and Larsen could convey their message through leafletting or sidewalk speeches. They are free to continue their picketing, which offers unique advantages to other forms of communication: immediate recognition by pedestrians and drivers, focused message delivery, and minimal expense. *See Baldwin*, 540 F.2d at 1368 (means of communication are not entirely fungible). The City's ordinance does not seek to limit the number of protesters or the times or frequency of their picketing. Therefore, we find that Foti and Larsen are not likely to prevail on the merits regarding the unconstitutionality of the ordinance's restrictions on the size and number of picket signs.

Foti and Larsen argue they have a First Amendment right "not only to advocate their cause but also to select what they believe to the most effective means for so doing." *Meyer*, 486 U.S. at 424, 108 S.Ct. at 1893. They posit that this First Amendment right protects their method of spreading their message—that is, a fifteen square foot sign with a picture of an aborted fetus and another fifteen square foot sign with a written anti-abortion message. Combining both the picture and the written message onto one smaller sign, they argue, violates their right to select the most effective way to advocate their cause.

In *Meyer*, the Supreme Court found that a prohibition against paying circulators of initiative petitions violated the First Amendment. The state statute restricted access to the circulators' chosen *avenue* of speech—direct one-on-one communication. *See id.* Likewise, the First Amendment protects Foti and Larsen's right to choose a particular means or avenue of speech—picketing—to advocate their cause in lieu of other avenues. This is not the same as saying that Foti and Larsen have a First Amendment right to dictate the *manner* in which they convey their message within their chosen avenue. Government may regulate the *man-*

*ner* of speech in a content-neutral way but may not infringe on an individual's right to select the *means* of speech.

▮▮▮ Regulations of the size and number of picket signs are permissible as long as they are "not so restrictive as to foreclose an effective exercise of First Amendment rights." *Verrilli*, 548 F.2d at 265. Clearly, there is a point at which a restriction on the size of a picket sign is so small that speech is no longer effective. We do not attempt to define the constitutional minimum, nor need we to decide this case. The district court had before it substantial evidence that pedestrians, a substantial portion of Foti and Larsen's intended audience, could see and read their three square foot signs. Drivers can also see their protest in front of a Planned Parenthood clinic and understand their message. Drivers may be unable to read the words of the smaller signs, but this result is permissible in light of the City's substantial interest in requiring drivers to devote greater attention to driving conditions and road signs. *See Candidates' Outdoor Graphic Serv. v. City and County of San Francisco,* 574 F.Supp. 1240, 1248 (N.D.Cal.1983). We conclude that while the City's regulation of the size and number of picket signs does burden speech, it does so in a minimal way, allowing for the effective exercise of free speech rights.[12]

▮▮▮ The second part of the ordinance requiring a picketer to actually move while holding a sign is unconstitutional because it is not narrowly tailored to the City's interest. The City argues that the "actually moving" requirement furthers its interest in the free flow of pedestrian traffic on public sidewalks.[13] Although the "actually moving" requirement may serve this interest in some circumstances, the record before us does not establish a reasonable fit between the City's means and ends. Requiring picketers to shuffle back and forth does not contribute to safe and convenient circulation on sidewalks; presumably, pedestrians could better negotiate around a stationary picketer than one who is walking back and forth. More importantly, the City offers no reason why only persons holding signs are required to keep moving. Protestors who shout, leaflet, or carry various props may stand still; so too may any large group of pedestrians on the sidewalk. A peaceful picketer carrying a sign creates no more of an obstacle than a picketer carrying a cross or a pedestrian waiting for a bus.[14]

The City seeks to prevent permanent encampments on sidewalks that block pedestrian traffic and intimidate passersby—a legitimate objective that could be achieved through the normal application of its police powers without burdening the manner of picketing. If a picketer obstructs pedestrians from using the sidewalk, he may be cited under another provision of the existing ordinance.[15] A picketer who uses a sign to block traffic or obscure drivers' views may also be cited under existing ordinances or other traffic laws. A picketer who harasses or assaults passersby may be cited for disturbing the peace or charged with assault. Obvious, less burdensome means for achieving the City's

---

**12.** Although Menlo Park's regulation is constitutional as applied to Foti and Larsen's activities, we are not convinced that the restriction could pass constitutional muster in a different as-applied challenge. For example, the restrictions on the size and number of signs also apply to those persons carrying signs in a park or during a parade, areas in which the City's interest in traffic safety are more questionable.

**13.** The City does not justify this provision by proffering its interest in aesthetics, and logically so—it is difficult to imagine how this provision reduces visual blight.

**14.** The nonsense of this distinction is demonstrated by a declaration of the City's police commander:

I have informed Rossi Foti and David Larsen that if they kneel and pray in the sidewalk while holding a cross with a sign attached to the cross that they will be in violation of [the ordinances]. I have also informed [Plaintiffs] that they may kneel and pray with the cross and/or the American flag as long as they are not displaying a sign while participating in those activities.

**15.** "No sign shall be posted at a location which obstructs or interferes with, or poses the threat of obstructing or interfering with, vehicular or pedestrian travel." Menlo Park Municipal Code § 8.44.030(3). Presumably, the City could draft a parallel provision to apply to picket signs.

aims are readily and currently available by employing traditional legal methods. *See Schneider*, 308 U.S. at 162, 60 S.Ct. at 151 (an antilittering statute could have addressed the substantive evil of littering without prohibiting leafletting). The movement requirement "fall[s] short of any reasonable requirement of necessity." *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 639 (9th Cir.1991) (quotation omitted).

The City cites *Frisby* to support its movement requirement as a reasonable manner restriction on speech. In *Frisby*, the Supreme Court held that a ban on focused or targeted picketing in a residential area was facially constitutional. 487 U.S. at 488, 108 S.Ct. at 2504. First, *Frisby* did not involve the same type of "movement" at issue in this appeal. *Frisby* addressed an ordinance that banned picketing "before or about" a residence but permitted general marching through a residential neighborhood or in front of a block of houses. *Id.* at 477, 483, 108 S.Ct. at 2498–99, 2501–02. It did not address the type of movement—picketers pacing in a line—that Menlo Park seeks to impose on protestors. Second, *Frisby*'s holding was explicitly based on the substantial and unique interest at stake: "the protection of residential privacy." *Id.* at 484, 108 S.Ct. at 2502. *Frisby*'s concerns for the tranquility of the home and captivity of the picketers' target are not implicated here, *see id.* at 487, 108 S.Ct. at 2503–04; "the intrusion may be avoided at the will of the observer." *Baldwin*, 540 F.2d at 1370. *Frisby* does not support Menlo Park's ordinance.

### C

As we have decided that Foti and Larsen have demonstrated probable success on the merits of some of their civil rights claims, we must consider whether they have demonstrated the possibility of irreparable harm. *See Gilder*, 936 F.2d at 422. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *see Jacobsen v. U.S. Postal Serv.*, 812 F.2d 1151, 1154 (9th Cir. 1987). Also, Foti has been cited for a viola-

tion of the ordinance and has been threatened with the loss of his car. Plaintiffs have met the conditions necessary to secure a preliminary injunction.

### CONCLUSION

Accordingly, we remand to the district court with instructions that it either: (a) issue a preliminary injunction against the enforcement of Menlo Park Municipal Code § 8.44.020(3), except as to §§ 8.44.020(3)(d) and (f)(1), or (b) preliminarily enjoin the enforcement of Menlo Park Ordinance No. 877 in its entirety until and unless the City amends the ordinance to comply with the contents of this opinion. The district court may grant Plaintiffs leave to amend their complaint to challenge amended Ordinance No. 877. On remand, the City may defend this ordinance, or any amendment made thereto in compliance with this opinion, by explaining why it could not achieve its legitimate interests through the normal application of its police powers or may abandon the ordinance in favor of other narrowly-tailored ordinances that further its interests.

REVERSED IN PART AND REMANDED WITH INSTRUCTIONS; AFFIRMED IN PART. *Each party to bear its own costs.*