**HONOLULU WEEKLY, INC.,
a Hawaii corporation,
Plaintiff–Appellee,**

**v.**

**Jeremy HARRIS, Mayor of the City and County of Honolulu; Carol L. Costa, Director of the Department of Customer Services; City and County of Honolulu; Roy K. Memiya, Director of the Department of Budget and Fiscal Services, Defendants–Appellants.**

· **Honolulu Weekly, Inc., a Hawaii corporation, Plaintiff– Appellant,**

.v.

**Jeremy Harris, Mayor of the City and County of Honolulu; Carol L. Costa, Director of the Department of Customer Services; City and County of Honolulu; Roy K. Amemiya, Director of the Department of Budget and Fiscal Services, Defendants–Appellees.**

**Nos. 01–15854, 01–15992.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 2002.

Filed Aug. 2, 2002.

Kathleen M. Sullivan, Special Deputy Corporation Counsel, City and County of Honolulu, Stanford, CA, for the defendants-appellants/cross-appellees.

Scott K. Saiki, Bickerton Saunders & Dang, Honolulu, HI, for the plaintiff-appellee/cross-appellant.

Before: WALLACE, TASHIMA and TALLMAN, Circuit Judges.

## OPINION

TALLMAN, Circuit Judge.

We must decide whether a City and County of Honolulu ordinance violates the First Amendment or the Equal Protection Clause of the United States Constitution or the corresponding provisions of the Hawaii Constitution. The ordinance requires all publishers who wish to distribute their publications along sidewalks in the Waikiki Special District to use one of two sets of newsracks—one reserved solely for publications that charge readers and one just for free publications. We hold that the ordinance is constitutional. We therefore reverse the partial summary judgment entered by the district court against the city.

Because we dismiss *Honolulu Weekly's* cross-appeal as being untimely, we do not address the propriety of the district court's award of partial summary judgment to the city based on the district court's determination that the ordinance is not content-based.

I

In 1976, in an effort to maintain and enhance community and scenic resources, the City and County of Honolulu established the Waikiki Special District in one of the most renowned, visited, and congested areas of the city. One of the ways the city sought to achieve its goals of enhancing aesthetics, reducing congestion, and promoting safety was by regulating the proliferation of newsracks within the special district. In 1988–89, the city began clustering newsracks along Kalakaua Avenue, the main thoroughfare in Waikiki, by having publishers distribute their publications in city-constructed racks that grouped the publications in different sized steel vending boxes according to whether or not they charged their readers. A couple of years later, in 1991, *Honolulu Weekly* was founded as a free weekly publication.

In 1997, the city passed the new ordinance, Ordinance 98–66, which became Article 15 of the Revised Ordinances of Honolulu ("Article 15" or "the ordinance"). Article 15 was designed to regulate newsracks throughout the Waikiki Special District. In passing the ordinance, the City Council identified three purposes for Article 15: (1) to protect pedestrian safety; (2) to preserve the district's aesthetics; and (3) to facilitate the distribution of publications.

Article 15 prohibited publishers from placing their privately constructed newsracks on public sidewalks and, instead, required all publishers to utilize the city's distribution system. That system entailed

the use of large "publication dispensing enclosures" erected near public sidewalks at specific locations within the district. The city created two types of enclosures—one for "coin-operated dispensing racks" and the other for smaller "noncoin-operated dispensing racks." Thus, as was the case along Kalakaua Avenue, the city segregated distribution of publications based on whether or not publishers charged their readers.

Article 15 required that the city provide at least one coin-operated rack and one noncoin-operated rack at each of the specified locations within the district. It also granted the city's Director of Budget and Fiscal Services (or the Director's duly authorized subordinate) the authority to increase the number of coin-operated and noncoin-operated racks beyond the required minimum.

Because the ordinance prohibited publishers from placing their own newsracks on the streets within the Waikiki Special District, and because space (especially the most desirable space within the district) is limited, Article 15 required the Director to hold two sets of lotteries—one for coin-operated racks and one for noncoin-operated racks—every three years to determine which publishers received permits for particular newsrack locations. The city made 288 coin-operated and 680 noncoin-operated spaces available in its first lottery in April 1999. Thirty-eight publishers took part in the first lottery. Four bid for coin-operated spaces; 34 bid for noncoin-operated spaces. Although *Honolulu Weekly* is a free publication, it bid for the coin-operated spaces because its owners wanted the paper to be distributed alongside the publications it considers to be its competitors, *The Honolulu Advertiser* and *Honolulu Star–Bulletin*, and because the

display window for the coin-operated newsracks is larger.[1] *Honolulu Weekly* also surmised it would have a better chance of obtaining the locations it desired by bidding with the coin-operated group and feared it would not be considered a credible media publication if lumped among the advertising leaflets and tourist promotional papers that constituted most of the free publications.

*Honolulu Weekly* won 21 newsrack spaces in the April 1999 lottery and planned to distribute its publication at those locales in standard coin-operated newsrack boxes that were of the same size as those of its fee-charging competitors. The city denied *Honolulu Weekly* its permits, however, when it discovered that *Honolulu Weekly* planned to disable the coin-operated mechanisms so as not to charge its readers.

*Honolulu Weekly* filed suit. The district court granted partial summary judgment to the city and partial summary judgment to *Honolulu Weekly*, holding that while the ordinance was content-neutral, it was not narrowly tailored to meet the city's asserted goals of improving aesthetics and safety. The district court awarded partial summary judgment to *Honolulu Weekly* on its Equal Protection claims, and issued a permanent injunction prohibiting the city from conducting lotteries that distinguished publications on the basis of whether or not they charged their readers. The city appealed the rulings on the First Amendment and Equal Protection claims, and *Honolulu Weekly* cross-appealed the district court's award of summary judgment as to whether the ordinance is content-based.

The district court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.

---

1. The coin-operated newsracks are larger than the noncoin-operated racks in order to accommodate the coin box and locking mech-

anism and because paid publications tend to be larger than free publications.

## II

 We review awards of summary judgment de novo. *See Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1257 (9th Cir.2001). We begin by dismissing *Honolulu Weekly's* cross-appeal. Under federal appellate rules, "[i]f one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later." Fed. R.App. Proc. 4(a)(3). The City and County of Honolulu filed its Notice of Appeal on April 26, 2001; *Honolulu Weekly* filed its cross-appeal on May 11, 2001. Thus, *Honolulu Weekly* filed *fifteen* days after the first Notice of Appeal was filed, not fourteen as required. While we have discretion to waive the requirement, *Honolulu Weekly* did not provide the Court with a reason to do so. We therefore dismiss the cross-appeal as untimely. *See S.M. v. J.K.,* 262 F.3d 914, 922–23 (9th Cir.2001).

## III

 Relying on the settled principle that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the City and County of Honolulu defends its ordinance as a time, place, or manner restriction on expression.[2] To qualify as such, the restriction must (1) be content-neutral; (2) be "narrowly tailored to serve a significant government interest;" and (3) "leave open ample alternative channels of communication." *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir.1998) (as amended) (citation omitted).[3]

### A

 "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Speech restrictions are content-neutral when they can be "justified without reference to the content of the regulated speech." *One World One Family Now v. City & County of Honolulu,* 76 F.3d 1009, 1012 (9th Cir.1996) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). A law that "confer[s] benefits or impose[s] burdens on

---

2. The city contends that the standard of review for time, place, or manner restrictions may not apply in this case, because the government is not regulating private newsracks but rather government newsracks on the sidewalks of the Waikiki · Special District. We find this argument unpersuasive. The city cannot ban private means of expression in one of the quintessential public forums, mandate that all speakers use its constructed mechanisms for speech in that forum, and then call for a lower standard of review by saying it is no longer a quintessential forum. *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), is not to the contrary. In that case, "[t]he postal side-walk at issue [did] not have the characteristics of public sidewalks traditionally open to expressive activity" but rather merely ran "from the parking area to the front door of the post office." *Id.* at 727, 110 S.Ct. 3115. The sidewalks in the Special District, on the other hand, are the sort traditionally open to expressive activity; we therefore review Article 15 as a time, place, or manner restriction.

3. The standard of review of the right of freedom of expression under the Hawaii Constitution is the same as that under the United States Constitution. *See In re Doe,* 76 Hawai'i 85,· 869 P.2d 1304, 1312–13 n. 16 (1994).

speech without reference to the ideas or views expressed" is normally content-neutral. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

■ Article 15 is content-neutral on its face. The ordinance sets up a system that segregates publications into two classes based on whether or not the publisher charges its readers,[4] not on the content of the publications. Publishers who use the coin-operated racks could be in the business of investigative reporting or advertising the sights and sounds of Oahu so long as they charge their readers.[5] Likewise, publications utilizing the noncoin-operated racks might engage in serious commentaries on the state of the world or sophomoric attempts at humor; what they have in common, however, is that they are all free to their readers.

Additionally, as the district court expressly found, there is no evidence that the city adopted the ordinance because of a disagreement with the message of the free publications. Any resulting burdens upon free publications such as *Honolulu Weekly* occur "without reference to the ideas or views expressed." *Turner*, 512 U.S. at 643, 114 S.Ct. 2445. While a "regulation neutral on its face may be content-based if its manifest purpose is to regulate speech because of the message it conveys," there is no indication here that Article 15 was designed "to favor programming of a particular subject matter, viewpoint, or format." *Id.* at 645–46, 114 S.Ct. 2445.

■ [4] Simply put, the city targeted the *manner* in which *Honolulu Weekly* is distributed, not the content of its message.[6] *See id.* at 645, 114 S.Ct. 2445.[7]

---

4. The language of the ordinance actually segregates the newsracks according to whether they are "coin-operated" or "noncoin-operated." The city interpreted the ordinance, however, to require that only those publishers that charge readers use the coin-operated racks and only those that do not charge use the noncoin-operated racks, thus foiling *Honolulu Weekly's* attempt to use a coin-operated rack by disengaging the collection mechanism so that the paper would remain free for readers. Though *Honolulu Weekly* originally sought to challenge the "coin-operated" term as being ambiguous, thereby making the ordinance subject to standardless discretion, *Honolulu Weekly* eventually abandoned this argument.

5. The city would have allowed *Honolulu Weekly* to keep the 21 permits it obtained in the initial lottery if only it agreed to charge its readers.

6. In addition to being facially neutral, there is no evidence that Article 15 has been applied in anything but a content-neutral manner. The district court rejected *Honolulu Weekly's* argument that the discretion the ordinance gives to the Director to determine how many racks and spaces will be made available for pay publications and how many will be made available for free publications indicated that the ordinance was content-based, and that the

city designed the system to favor pay publications by giving the charging publications much better odds at receiving the spaces they desired than the free publications in the first lottery. We agree, given that the number of newsracks made available in the first lottery was based on historical information. The district court refused to consider *Honolulu Weekly's* argument that the discretion of city officials to increase or decrease the number of coin-operated or noncoin-operated racks amounted to a prior restraint because the argument had only been made with respect to *Honolulu Weekly's* due process claim. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[A] licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."). We offer no opinion as to whether *Honolulu Weekly* could successfully bring an as applied challenge if the city did not remedy the disparity in odds during future lotteries.

7. Because *Honolulu Weekly* was still free to distribute its paper, its reliance on *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), is misplaced. In that case, the City of

## B

We next consider whether the city's ordinance is "narrowly tailored to serve a significant government interest." *Foti*, 146 F.3d at 635. We hold that it is.

■ "Narrow tailoring" does not require the government to adopt the "least restrictive or least intrusive means of serving the statutory goal" when the regulation does not completely foreclose any means of communication. *Hill v. Colorado*, 530 U.S. 703, 726, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The requirement that the regulation be "narrowly tailored" will be met "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" and the regulation is not "substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 799–800, 109 S.Ct. 2746 (citation omitted).

■ According to its legislative history, Article 15 was enacted for three reasons: (1) to protect the health, safety, and welfare of pedestrians; (2) to preserve Waikiki's aesthetics; and (3) to facilitate the distribution of publications. The government has a substantial interest in protecting the health and welfare of its citizens. *One World*, 76 F.3d at 1013 ("[C]ities have a substantial interest in assuring safe and convenient circulation on their streets."). Additionally, both the Supreme Court and this Court have found that aesthetics can be a substantial governmental interest. *See, e.g., Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("[T]he state may legitimately exercise its police powers to advance esthetic values."); *One World*, 76 F.3d at 1013 ("[C]ities have a substantial interest in protecting the aesthetic appearance of their communities by 'avoiding visual clutter.'") (citation omitted).

The City and County of Honolulu determined in 1976 that preserving the Waikiki Special District was essential for tourism and residential life. The City Council believed that having rows of disparate newsracks strewn up and down Waikiki's streets constituted visual clutter. Article 15 was designed to combat this perceived problem. Additionally, Article 15 was designed to alleviate safety concerns given that the streets and sidewalks of the tourist-laden Special District had become rather congested. Article 15 therefore meets the requirement of serving substantial government interests that would not otherwise be achieved without the regulation.

■ Nor is the ordinance substantially broader than necessary. The City and County of Honolulu sought to enhance aesthetics in the Waikiki Special District by compelling publishers to remove their cluttered and dissimilar newsracks and utilize a uniform series of enclosures within the Special District. The city established two sets of enclosures—one for coin-operated newsracks to be used by publications that charged their readers and one for noncoin-operated racks for free publications. This content-neutral scheme balances various needs and goals: maximizing the uniformity in the appearance of newsracks, accommodating the coin-collecting apparatus that the charging publications must use, and minimizing the space newsracks require on city streets by requiring free publications that do not need a coin-collecting apparatus to use the smaller, space-saving newsracks.[8]

---

Cincinnati sought to ban completely commercial publications from sidewalk newsracks, and the Supreme Court found that the commercial/noncommercial distinction the city drew was content-based. *See id.* at 412, 429, 113 S.Ct. 1505. Article 15, on the other hand, makes a free/pay distinction unrelated to content.

8. Simply drawing a distinction among speakers is not enough to establish a First Amendment violation. *See, e.g., Turner*, 512 U.S. at

■ So as not to favor certain types of publications, the city required the coin-operated and noncoin-operated racks to be present at the same locations. *Honolulu Weekly* contends that it is harmed, nonetheless, because the city's division prevents it from being viewed by potential readers alongside the publications it considers its major competitors—the fee-charging *Advertiser* and *Star–Bulletin* newspapers. Moreover, *Honolulu Weekly* complains that the coin-operated racks have bigger display windows and that it cannot display the entire front page of its publication in the small noncoin-operated racks.

To remedy these supposed ills, *Honolulu Weekly* proposes a cure that is far worse than the city's method of treating visual blight. *Honolulu Weekly* contends that the city should distinguish between serious journalism and those publications that merely promote tourism and local goods and services and segregate the publications accordingly. Of course, implementing such a plan would require the government to examine and judge the content of each publication and then to establish a two-tiered system based on a subjective evaluation of that content. Such a form of journalistic segregation would raise serious constitutional concerns to say the least. *See Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

The district court rightly rejected *Honolulu Weekly's* proposed solution but also faulted the city's scheme, stating: ·

Having fixed locations for dispensing racks clearly alleviates safety hazards for pedestrians. However, whether a publication is free or for sale has nothing at all to do with those safety hazards. Similarly, whether a person pays for a publication or gets it for free does not affect aesthetics, as there is no relation between the act of dropping a coin into a box and aesthetics.

The district court suggested that the city could · distinguish between publications based on the size of the publication rather than whether they charge readers. Whether this manner of addressing the problems of aesthetics and safety, or any possible alternatives we could think of, might have been better than the one chosen by the City and County of Honolulu is not our concern because the ordinance is not "*substantially* broader than necessary to achieve [the city's desired goals]." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746 (emphasis added). We do not compel more.

The district court tried a little too hard to imagine an ordinance that would best balance the goals of the city with the desires of publishers. While it is true that "pointing out the alternatives available," does not necessarily mean advocating the rejected least restrictive test, *Project 80's, Inc. v. City of Pocatello,* 942 F.2d 635, 638 (9th Cir.1991), that appears to be what the district court sought to do in this case. Because we will not inquire into whether the city's method of addressing the problems was the best possible solution or the least restrictive means of doing so, we find that the ordinance is narrowly tailored to meet the city's stated interests.[9]

645, 114 S.Ct. 2445 (upholding a law that favored broadcasters over cable programmers because the distinction was based "upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry"); *Leathers v. Medlock,* 499 U.S. 439, 453, 111 S.Ct. 1438, 113 L.Ed.2d 494

(1991) (upholding a state sales tax system that taxed cable services but exempted newspapers, magazines, and satellite broadcasting systems).

**9.** We choose not to speculate whether a patron coming upon the city's newsracks in

## C

■ The city's ordinance clearly "leave[s] open ample alternative channels of communication." *Foti*, 146 F.3d at 635. *Honolulu Weekly* and the other free publications still have the opportunity to distribute their publications by way of the noncoin-operated racks, as well as other distribution mechanisms inside and outside of the Waikiki Special District.

Because we find that Article 15 meets the three criteria necessary to be a valid time, place, or manner restriction, we hold that it does not violate the First Amendment.

## IV

■ "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).[10] In determining whether a statute, regulation, or ordinance violates the Equal Protection Clause of the United States Constitution, we begin our analysis by determining the proper level of scrutiny to apply for review. We apply strict scrutiny if the governmental enactment "targets a suspect class or burdens the exercise of a fundamental right." *United States v. Hancock*, 231 F.3d 557, 565 (9th Cir.2000). When applying strict scrutiny, we ask "whether the [ordinance] is narrowly tailored to serve a compelling governmental interest." *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir.2001). If the ordinance does not concern a suspect or semi-suspect class or a

fundamental right, we apply rational basis review and simply ask whether the ordinance "is rationally-related to a legitimate governmental interest." *Id.*

■ That *Honolulu Weekly* is similarly situated to the charging publications subject to Article 15 is obvious. As the district court stated:

> The only real difference the City points to for purposes of Ordinance 98–66 is whether the publication is for sale or not. The City argues that *Honolulu iWeekly* and the dailies are not similarly situated because *Honolulu Weekly* is free. This argument is circular. Having created the distinction between publications for sale and free publications, the City attempts to justify the distinction based on the distinction … The essential characteristic of the *Honolulu Weekly* and the dailies is that they attempt to convey a message. They are similarly situated for purposes of equal protection analysis.

The district court failed to determine the appropriate level of scrutiny for review, however, because it held that Article 15 could not survive even under a rational basis review. The district court erred in this regard. We hold that the ordinance is not content-based and does not infringe upon a fundamental right and therefore apply rational basis review. As such, Article 15 passes muster.

While "[i]t is beyond dispute that the right to distribute newspapers is protected under the First Amendment," *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 182 (1st Cir.1996);

---

search of a serious discussion of local issues would ever assume that it could only be found in the "top-tier" rack that displays the publications in larger windows, charges readers, and seems more exclusive inasmuch as it houses less than half as many publications as the free newsrack nearby.

**10.** Equal Protection is analyzed similarly under the United States and Hawaii Constitutions. *See State v. Miller*, 84 Hawai'i 269, 933 P.2d 606, 613 (1997).

*see also Plain Dealer*, 486 U.S. at 768, 108 S.Ct. 2138 ("[L]iberty of circulating is as essential to freedom of expression as liberty of publishing; indeed, without the circulation, the publication would be of little value.") (quoting *Ex parte Jackson*, 96 U.S. 727, 733, 24 L.Ed. 877 (1878)), we only apply strict scrutiny when a distinction among speakers is made on the basis of content. *See Leathers*, 499 U.S. at 453, 111 S.Ct. 1438. We have already held Article 15 to be content-neutral; therefore, strict scrutiny is not appropriate.

Having determined that rational basis review applies, we ask whether the ordinance is "rationally-related to a legitimate governmental interest." *Ball*, 254 F.3d at 823. Improving safety and aesthetics are substantial government interests; thus, the ordinance easily passes the "legitimate interest" test. The ordinance is a rational attempt to achieve these interests; therefore, the ordinance does not violate the Equal Protection Clause of the United States Constitution.

## V

Because the cross-appeal by *Honolulu Weekly* in No. 01–15992 was untimely, it is DISMISSED. We REVERSE and REMAND the judgment of the district court with instructions to enter summary judgment completely in favor of the City in No. 01–15854. Each party shall bear its own costs.