**HUMANITARIAN LAW PROJECT, et al., Plaintiffs,**

v.

**Janet RENO, as Attorney General of the United States, et al., Defendants.**

**No. CV 98–1971 ABC (BQRx).**

United States District Court, C.D. California.

June 15, 1998.

---

**1206**

David Cole, Georgetown University Law Center, Washington, DC, Nancy Chang, Center for Constitutional Rights, New York City, Paul Hoffman, Carol Sobel, Center for Constitutional Rights, Santa Monica, CA, Visuvanathan Rudrakumaran, New York City, for Plaintiffs.

Frank W. Munger, Assistant Attorney General, David J. Anderson, John R. Tyler, Martha E. Rubio, Department of Justice, Civil Division, Los Angeles, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COLLINS, District Judge.

The Court makes the following findings of fact and conclusions of law with respect to the Motion for Preliminary Injunction of Plaintiffs HUMANITARIAN LAW PROJECT, RALPH FERTIG, ILANKAI THAMIL SANGAM, TAMILS OF NORTHERN CALIFORNIA, TAMIL WELFARE AND HUMAN RIGHTS COMMITTEE, FEDERATION OF TAMIL SANGAMS OF NORTH AMERICA, WORLD TAMIL COORDINATING COMMITTEE, and NAGALINGAM JEYALINGAM:

### FINDINGS OF FACT

#### The Regulatory Scheme

1. President Clinton signed the Antiterrorism and Effective Death Penalty Act ("AEDPA") into law on April 24, 1996. Section 302 of the AEDPA permits the Secretary of State (the "Secretary"), in consultation with the Secretary of the Treasury and the Attorney General, "to designate an organization as a foreign terrorist organization ... if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity ...; and (C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1). The AEDPA defines "terrorist activity" as "an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time." *Id.* § 1182(a)(3)(B)(iii). "National security" is defined as "the national defense, foreign relations, or economic interests of the United States." *Id.* § 1189(c)(2).

2. Prior to designating an organization as a foreign terrorist organization, the Secretary must notify specified members of Congress. *See id.* § 1189(a)(2)(A). Seven days thereafter, the Secretary must publish the designation in the Federal Register. *See id.*

The designation is effective upon publication. *See id.* § 1189(a)(2)(B).

3. A group designated as a foreign terrorist organization may seek judicial review of the Secretary's designation by filing an action in the United States Court of Appeals for the District of Columbia within 30 days of the published designation. *Id.* § 1189(b)(1). Any review "shall be based solely upon the administrative record, except that the Government may submit, for ex parte and in camera review, classified information used in making the designation." *Id.* § 1189(b)(2). Section 1189 sets forth certain circumstances wherein the Court of Appeals may set aside the Secretary's designation.[1] In addition to the Court of Appeals setting aside a designation, a group may cease to be designated as a foreign terrorist organization if: (1) the Secretary fails to renew the designation after two years, *see id.* § 1189(a)(4)(B); (2) Congress blocks or revokes a designation, *see id.* § 1189(a)(5); or (3) the Secretary revokes the designation based on a finding that changed circumstances or national security warrants such a revocation. *See id.* § 1189(a)(6)(A).

4. Section 303 of the AEDPA provides: "Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both." 18 U.S.C. § 2339B(a). The AEDPA defines the term "material support or resources" as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." *Id.* § 2339A(b).

## The Secretary's Designation

5. On October 8, 1997, the Secretary designated 30 organizations as "foreign terrorist organizations" under the AEDPA. *See* 62 Fed.Reg. 52,649–51. The designated organizations included the Kurdistan Workers' Party, a.k.a. Partiya Karkeran Kurdistan, a.k.a. PKK ("PKK") and the Liberation Tigers of Tamil Eelam, a.k.a. LTTE, a.k.a. Tamil Tigers, a.k.a. Ellalan Force ("LTTE"). On November 6, 1997, the LTTE sought judicial review of the Secretary's designation. To date, the Court of Appeals has not rendered a decision. The PKK did not seek judicial review of the designation.

## The Plaintiffs

6. Plaintiffs are six organizations and two United States citizens. Plaintiffs seek to provide support to the humanitarian and political activities of the PKK and the LTTE. Since October 8, 1997, the date on which the Secretary designated the PKK and the LTTE as foreign terrorist organizations, Plaintiffs and their members and individuals associated with the organizational Plaintiffs have not provided such support, fearing criminal investigation, prosecution, and conviction.

## The PKK and the Plaintiffs That Support it

7. The PKK was formed approximately 20 years ago with the goal of achieving self-determination for the Kurds in Southeastern Turkey. It is comprised primarily of Turkish Kurds. The PKK is the leading political organization representing the interests of the Kurds in Turkey. Plaintiffs allege that for more than 70 years, the Turkish government has subjected the Kurds to human rights abuses and discrimination. The PKK's efforts on behalf of the Kurds include political organizing and advocacy and diplomatic ac-

---

1. Section 1189(b)(3) provides:
   The Court shall hold unlawful and set aside a designation the court finds to be—
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;
   (C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;
   (D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2) or
   (E) not in accord with the procedures required by law.
   8 U.S.C. § 1189(b)(3).

tivity around the world. It organizes political forums, international conferences, and cultural festivals outside Turkey to bring attention to the plight of the Kurds there. It publishes and distributes newspapers and pamphlets championing the Kurds' cause and denouncing human right violations. It provides social services and humanitarian aid to Kurds in exile, has established a quasi-governmental structure in areas of Turkey under its control, and defends the Kurds from alleged Turkish human rights abuses.

8. Two Plaintiffs, Humanitarian Law Project ("HLP") and Administrative Judge Ralph Fertig,[2] HLP's President, seek to support the PKK's peaceful and non-violent activities. The HLP, a not-for-profit organization headquartered in Los Angeles, is dedicated to furthering international compliance with humanitarian law and human rights law and the peaceful resolution of armed conflicts.[3]

9. The HLP has consultative status to the United Nations ("UN") as a non-governmental organization and regularly participates in meetings of the UN Commission on Human Rights in Geneva, Switzerland. The HLP conducts fact-finding missions, writes and publishes reports, and works for the peaceful resolution of armed conflicts around the world.

10. Judge Fertig has a career of over 50 years in human rights work. He has been a member of the HLP's Board of Directors since 1989, serving as President from 1993 to 1995 and from 1997 to the present. He has participated in HLP delegations that have investigated alleged human rights violations in Turkey, Mexico, and El Salvador, has written reports for the HLP, and has trained others in the use of international human rights law and other lawful means for the peaceful resolution of disputes.

11. Since 1991, the HLP and Judge Fertig have devoted substantial time and resources advocating on behalf of the Kurds living in Turkey and working with the PKK.

Judge Fertig and other individuals associated with the HLP have conducted fact-finding investigations on the Kurds in Turkey and have published reports and articles presenting their findings, which are supportive of the PKK and the struggle for Kurdish liberation. They assert that the Turkish government has committed extensive human rights violations against the Kurds, including the summary execution of more than 18,000 Kurds, the widespread use of arbitrary detentions and torture against persons who speak out for equal rights for Kurds or are suspected of sympathizing with those who do, and the wholesale destruction of some 2,400 Kurdish villages. Applying international law principles, they have concluded that the PKK is a party to an armed conflict governed by Geneva Conventions and Protocols and, therefore, is not a terrorist organization under international law.

12. To further peaceful resolutions of the armed conflict in Turkey and protect the human rights of the Kurds, the HLP, Judge Fertig, and other individuals associated with the HLP have worked with and supported the PKK in numerous ways. They have advocated for the political freedoms and human rights of the Kurds and the PKK before the UN Commission on Human Rights, and have urged the UN to extend to the PKK the protections of the Geneva Conventions and Protocols. They have petitioned members of Congress to support Kurdish human rights and to encourage negotiations between the PKK and the Turkish government. They have argued for the release of Leyla Zana, Hatip Dicle, Orhan Dogan, and Selim Sadak, four Kurds who were elected to the Turkish Parliament in 1991, but sentenced to 15 years in prison by the Turkish courts for being members or supporters of the PKK. Finally, the HLP, Judge Fertig, and other individuals associated with the HLP have also assisted and trained some PKK members in using humanitarian law and international human

---

**2.** Although Judge Fertig is an administrative judge for the United States Equal Employment Opportunity Commission, he sues solely in his personal capacity.

**3.** The HLP was absorbed by the International Educational Development, Inc. ("IED") in 1989.

The HLP is sometimes referred to as the International Educational Development, Inc.*Humanitarian Law Project ("IED*HLP"). The IED was formed in the 1950's by a group of Jesuit Fathers to conduct non-sectarian work to aid schools, hospitals, and impoverished third world communities.

rights law and in seeking a peaceful resolution of the conflict in Turkey. Both the HLP and Judge Fertig only support the PKK in its non-violent and lawful activities.

13. Since the Secretary designated the PKK as a foreign terrorist organization, the HLP and Judge Fertig have been frustrated in their efforts to improve conditions for the Kurds living in Turkey. But for the AEDPA, they would continue to provide the forms of support which they had previously provided, and would provide further support as well. The HLP and Judge Fertig fear, however, that continuing to do so would subject them to criminal investigation, prosecution, and conviction.

14. The HLP, Judge Fertig, and individuals associated with the HLP would specifically like to, but are afraid to, provide support to the PKK in the following ways:

(1) solicit funds for, and make cash contributions to the PKK's political branch, for its lawful political work on behalf of the Kurds' human rights and for humanitarian assistance to Kurdish refugees;

(2) advocate on PKK's behalf before the UN Commission on Human Rights and the United States Congress;

(3) train the PKK in how to engage in political advocacy and on how to use international law to seek redress for human rights violations;

(4) write and distribute publications supportive of the PKK and the cause of Kurdish liberation;

(5) advocate for the freedom of Turkish political prisoners convicted of being PKK members or supporters;

(6) work with PKK members at peace conferences and other meetings toward the cause of peace and justice for the Kurds; and

(7) provide lodging to PKK members in connection with these activities.

15. HLP and Judge Fertig are committed to providing the above-mentioned support.[4] They have been deterred from providing it, however, fearing criminal sanctions under §§ 302 and 303 of the AEDPA.

### The LTTE and the Plaintiffs that Support it

16. The LTTE was formed in 1976 with the goal of achieving self-determination for the Tamil residents of Tamil Eelam, the Northern and Eastern provinces of Sri Lanka. Plaintiffs allege that the Tamils constitute an ethnic group that, for decades, has been subjected to human rights abuses and discriminatory treatment by the Sinhalese, who have governed Sri Lanka since the nation gained its independence from Great Britain in 1948. The Sinhalese constitute a numerical majority of Sri Lanka's population.

17. Plaintiffs further allege that the LTTE, to further its goal of self-determination for the Tamils, engages in: (1) political organizing and advocacy; (2) diplomatic activity; (3) the provision of social services and economic development through the establishment of a quasi-governmental structure in Tamil Eelam; (4) humanitarian aid to Tamil refugees fleeing from the Sri Lankan armed forces; and (5) defense of the Tamil people from human rights abuses.

18. The LTTE also administers a chain of orphanages in Tamil Eelam, including the Chensoilai and Kantharupan Orphanages. Through the Tamil Eelam Economic Development Organization, the LTTE supports the development of Tamil Eelam's economy, from agriculture to transportation. It also regularly issues publications regarding the political situation in Sri Lanka. It administers a civil police force that maintains public safety in areas under LTTE control. Finally, the LTTE administers the Tamil Eelam Education Secretariat that oversees children's educational services.

19. Six Plaintiffs—four membership organizations, an organizational Plaintiff, and an individual—seek to provide support to the LTTE. These Plaintiffs are committed to the human rights and well-being of the Tamils in Sri Lanka. Many members of these organizations, many of the individuals associated with the organizational plaintiff, and the individual Plaintiff, Dr. Nagalingam Jeyalingam, are Tamils born in Sri Lanka. Although

---

4. Judge Fertig would also like to solicit for and make contributions to the international cam-

paign to free political prisoners Zana, Dicle, Dogan, and Sadak.

they now reside in the United States and many are United States citizens, they still have close friends and family members living in Sri Lanka, many of whom have allegedly been the victims of abuses by the Sri Lankan government.

### Ilankai Thamil Sangam

20. Plaintiff Ilankai Thamil Sangam ("Sangam"), a New Jersey not-for-profit corporation founded in 1977 has approximately 135 members, most of whom are Tamils born in Sri Lanka. The Sangam's objectives are to promote the association of Tamils in the New York City metropolitan area, to promote knowledge of the Tamil language, culture, and heritage, and to provide humanitarian assistance to the Tamils in Sri Lanka, many of whom are refugees and orphans in need of the basic necessities of life, including food, clothing, and housing. The Sangam, as an organization, and many of its members, as individuals, would like to solicit and make donations of cash, clothing, food, including prepared food for infants, and educational materials, to the LTTE for humanitarian assistance to the Tamils in Sri Lanka. Sangam specifically wishes to support the LTTE-run Chensoilai and Kantharupan orphanages.

21. Neither the Sangam nor its members seek to support any military or unlawful activities of the LTTE. The Sangam and its members have been deterred from providing the above-described aid by the AEDPA. They have been deterred from freely engaging in political discussions on the topic of soliciting and making donations to the LTTE and organizations affiliated with the LTTE.

### Dr. Nagalingam Jeyalingam

22. Plaintiff Dr. Nagalingam Jeyalingam is a naturalized United States citizen who is a Tamil from Sri Lanka. Dr. Jeyalingam, a surgeon, was President of Sangam from 1995 to 1997 and is currently one of its committee members. Members of Dr. Jeyalingam's family, including his mother, brothers, and sisters, were displaced from their homes and forced to flee from Sri Lanka to India as refugees in 1983.

23. Dr. Jeyalingam has made cash donations to organizations that provided assistance to Tamil refugees in Sri Lanka and encouraged others to make such donations.

Dr. Jeyalingam believes that the LTTE plays a crucial role in providing humanitarian aid, social services, and economic development to the Tamils in Sri Lanka. But for the AEDPA, Dr. Jeyalingam would support the lawful and non-violent activities of the LTTE by providing the following:

(1) food and clothing to the Tamil Eelam Economic Development Organization, a branch of the LTTE engaged in economic development activities in Tamil Eelam including assisting refugees, implementing plans to develop the area's agriculture, forestry, fishing, and industries, and conducting environmental surveys;

(2) school supplies, books, and other educational materials to the Tamil Eelam Education Secretariat;

(3) money to the LTTE to pay for its legal fees and costs in challenging the Secretary's decision to designate the LTTE as a foreign terrorist organization;

(4) money to support the LTTE's political work, including the dissemination of written publications describing the plight of the Tamils in Sri Lanka to exile communities around the world; and

(5) money to support the LTTE's work in providing medical and rehabilitative assistance to Tamil victims of landmine explosions.

24. Dr. Jeyalingam only wishes to support the LTTE's humanitarian, social, and political efforts, and does not wish to support the LTTE's military activities. Dr. Jeyalingam wishes to but is afraid to provide assistance for fear of criminal prosecution.

### Tamils of Northern California

25. Plaintiff Tamils of Northern California ("TNC"), a California not-for-profit organization founded in 1994, has approximately 120 members, most of whom are Tamils who were born in Sri Lanka and who are United States citizens and non-citizens. TNC's primary objectives include providing opportunities for Tamils in the Northern California area to share their knowledge of Tamil cul-

ture, politics, and history, and providing humanitarian assistance to the Tamils of Sri Lanka.

26. The TNC and its members would like to donate money as well as children's supplies, including infant formula, baby food, children's shoes and clothing, school books, and toys, to the LTTE-run orphanages. They seek to do so as a means of expressing their support for the self-determination of the Tamil people in Sri Lanka. Neither the TNC nor its members seek to support the LTTE's military activities. The TNC and its members have been deterred from providing such support for fear that they will be criminally prosecuted under the AEDPA.

### World Tamil Coordinating Committee

27. Plaintiff World Tamil Coordinating Committee (the "WTCC"), an organization based in Jamaica, New York, has distributed LTTE literature and informational materials throughout the United States since 1987 to advocate on behalf of the Sri Lankan Tamils' human rights. Part of the WTCC's founding purpose is to advocate on behalf of the human rights and self-determination of the Sri Lankan Tamils. Since the enactment of the AEDPA, many individuals who were receiving LTTE literature from the WTCC have asked the WTCC to stop distributing it to them because they fear that it could lead to criminal investigation, prosecution, and conviction. Many of the WTCC's former donors have stopped making contributions out of fear of criminal investigation and prosecution for providing material support to the LTTE. The WTCC does not intend any of its activities to further any illegal ends.

### Federation of Tamil Sangams of North America

28. Plaintiff Federation of Tamil Sangams of North America ("FETNA") is a non-profit corporation founded in 1986. FETNA's membership includes 30 Sangams in the United States. The FETNA member Sangams are comprised mainly of United States citizens and legal permanent residents who are ethnic Tamils from all over the world, including India and Sri Lanka.

29. FETNA's purposes are to encourage appreciation of Tamil language, literature, arts, cultural heritage and history, and friendship among the Tamils and the Tamil Sangams around the world. FETNA, its member Sangams, and its individuals members would like to make donations to the LTTE for humanitarian assistance to Tamil refugees in Sri Lanka. They are afraid, however, of being criminally prosecuted for doing so. FETNA does not seek to support any unlawful or military activities of the LTTE.

### Tamil Welfare and Human Rights Committee

30. Finally, Plaintiff Tamil Welfare and Human Rights Committee ("TWHRC") is a Maryland association of approximately 100 Tamils, both United States citizens and non-citizens. Its primary objectives are to protect the human rights of the Tamils in Sri Lanka and to promote their health, social well-being, and welfare. Its members are concerned about the destitute Tamil refugees in the war-torn areas of Northeast Sri Lanka who have lost their homes and been forced to flee. The TWHRC, as an organization, and its members, as individuals, would like to provide money to the major organizations in Sri Lanka that provide direct relief, medical, and social services to these refugees, including the Tamil Eelam Economic Development Organization. Because of the AEDPA, however, the TWHRC and its members have been deterred from doing do. The TWHRC seeks only to support the LTTE's humanitarian efforts and does not seek to support the LTTE's military activities.

31. Any conclusions of law which are deemed to be findings of fact are incorporated herein by reference.

## CONCLUSIONS OF LAW

1. Jurisdiction and venue are proper in this court.

### Guilt by Mere Association

2. Plaintiffs have not established a probability of success on the merits that the AEDPA's prohibition on all material support to designated terrorist organizations, regardless of the individual's lack of intent to further illegal activities, violates their First Amendment rights to freedom of speech and

association and, thus, are not entitled to a preliminary injunction on this claim.[5]

3. The AEDPA's prohibition on providing any financial contributions to the PKK and LTTE is a content-neutral limitation on Plaintiffs' right to freedom of association, because it is unrelated to the suppression of the communicative nature of Plaintiffs' associational activities. *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Order at Section IV.A.2.

■ 4. As a content-neutral regulation incidentally burdening Plaintiffs' First Amendment rights, the AEDPA is subject to an intermediate scrutiny level of review as articulated in *O'Brien*. *Turner Broadcasting*, 512 U.S. at 642, 114 S.Ct. 2445; *O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673; Order at Section IV.A.2.

5. The Court concludes that the AEDPA does not impose "guilt by association alone" in violation of the First Amendment because the AEDPA only limits the permissible *ways* in which Plaintiffs can associate with the PKK and LTTE, rather than punishing Plaintiffs' ability to exercise their First Amendment right to associate with the PKK and LTTE altogether. Order at Section IV. B.1.[6]

6. In analyzing whether the AEDPA's regulation of Plaintiffs' First Amendment activities is justified, the Court determines: (1) whether the regulation is within the power of the government; (2) whether the regulation furthers an important or substantial governmental interest; (3) whether the proffered interest is unrelated to the suppression of free expression; and (4) whether the incidental restriction on First Amendment freedoms is no greater than is essential to further the important interest. *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673.

7. The enactment of the AEDPA is within the constitutional power of the government. "The Supreme Court has long recognized the broad authority accorded the national government in the foreign policy realm." *Palestine Information Office v. Shultz*, ("*PIO*"), 853 F.2d 932, 940 (C.A.D.C. 1988) (citing *Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984)).

8. The AEDPA furthers the government's substantial interest in national security and foreign relations. *See, e.g., Farrakhan v. Reagan*, 669 F.Supp. 506, 510–12 (D.D.C.1987), *aff'd without opinion*, 851 F.2d 1500 (1988) (government has a "compelling" interest in national security and ending "state-sponsored" terrorism); Order at Section IV.B.2.b.

9. The government's interest in prohibiting contribution for political and humanitarian activities to the PKK and LTTE is not related to the suppression of Plaintiffs' political speech or advocacy of the PKK's and LTTE's political agenda. Order at Section IV.B.2.c.

10. The AEDPA restricts Plaintiffs' right to political association and expression no more than is essential to further its compelling interest in national security and foreign policy. *See* 18 U.S.C. § 2339B note ("foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."); *Farrakhan*, 669 F.Supp. at 512 (upholding economic sanctions against Libya, including contributions to *religious* organizations and stating that "in the face of the national security interest lying behind the sanction regulations [directed at Libya], we conclude that there is no alternative that would allow organizations to speak through contributions while still allowing the government to effectuate its legitimate and compelling interests in national security"); Order at Section IV.B.2.d.

---

**5.** *See* Section IV of this Court's June 8, 1998 Order for a more detailed analysis supporting the Court's conclusions of law regarding Plaintiffs' claim that the AEDPA violates the First Amendment for imposing guilt by mere association ("Order").

**6.** *See* Order at 28–31 (distinguishing *American–Arab Anti–Discrimination Committee v. Reno*, 70 F.3d 1045, 1058 (9th Cir.1995) and *American–Arab Anti–Discrimination Committee v. Reno*, 119 F.3d 1367, 1376 (9th Cir.1997), *cert. granted in part*, —— U.S. ——, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998)).

11. The AEDPA's exemption for medicine and religious materials does not render the statute's limitations on Plaintiffs' right to freedom of association greater than is essential. *See* Order at 42–44.

12. Based on the foregoing, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the AEDPA's prohibition of all contributions to the PKK and LTTE despite Plaintiffs' lack of specific intent to further illegal activities is an impermissible restriction on their First Amendment freedoms.[7]

### Vagueness

13. For the reasons set forth in the Court's June 8, 1998 Order, Plaintiffs have not established a probability of success on their claims that the AEDPA: (1) affords the Secretary unfettered discretion; or (2) is impermissibly vague because it grants the Secretary unfettered discretion.

14. Plaintiffs have, however, demonstrated a probable success on the merits and irreparable injury based on their claim that the AEDPA is impermissibly vague because it fails to provide adequate notice as to what constitutes "material support or resources." Specifically, the Court concludes that the terms "personnel" and "training" are impermissibly vague. Thus, Plaintiffs are entitled to a preliminary injunction. *See International Jensen v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993).

15. A challenge to a statute based on vagueness grounds requires the court to consider whether the statute is sufficiently clear so as not to cause persons " 'of common intelligence ... necessarily [to] guess at its meaning and [to] differ as to its application.' " *United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir.1996) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

16. Vague statutes are void for three reasons: "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers;

and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Foti v. City of Menlo Park,* 146 F.3d 629, 638 (9th Cir.1998) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

17. "A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited." *United States v. Makowski,* 120 F.3d 1078, 1081 (9th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 610, 139 L.Ed.2d 497 (1997); *see also Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1057 (9th Cir.1986) ("A fundamental requirement of due process is that a statute must clearly delineate the conduct it proscribes.") (citing *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294). "A statute must be sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.' " *Foti,* 146 F.3d at 638 (quoting *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294).

18. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "[W]hen First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Foti,* at 638.

19. "[D]ue process does not require 'impossible standards' of clarity." *Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (quoting *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947)). "[W]e can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. Nevertheless, "[t]he requirement of clarity is enhanced when criminal sanctions are at issue or when the statute abuts upon sensitive areas of basic First Amendment freedoms." *Information Providers' Coalition for the De-*

---

7. *See also* Order at 20 n.45 (concluding that even under strict scrutiny analysis AEDPA's prohibi-

tion on all contributions is justified).

**1214**

*fense of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir.1991) (quotation omitted); *see also Kolender*, 461 U.S. at 357, 103 S.Ct. 1855 (stating that statutes imposing criminal penalties are void for vagueness if they fail to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"); *United States v. Robel*, 389 U.S. 258, 275, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ("The areas of permissible indefiniteness narrows ... when the regulation invokes criminal sanctions and potentially affects fundamental rights.") (Brennan, J., concurring). Thus, under the Due Process Clause, a criminal statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

20. The determinative issue is whether the AEDPA sufficiently identifies the prohibited conduct. *See Makowski*, 120 F.3d at 1081. Because the AEDPA provides for criminal sanctions for those who provide material support to foreign terrorist organizations, "[t]he requirement of clarity is enhanced." *Information Providers' Coalition*, 928 F.2d at 874.[8] In this case, the terms "personnel" and "training" are not "sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti*, at 638 (quoting *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294).[9]

21. The AEDPA contains no language which limits the prohibition of "personnel" to people working at the headquarters and at the direction of foreign terrorist organizations.

22. HLP and Judge Fertig have advocated for the PKK before the UN Commission on Human Rights, petitioned members of Congress, and advocated for the freedom of four Turkish political prisoners convicted of being PKK members or supporters. Additionally, HLP and Judge Fertig would like to but are afraid to write and distribute publications supportive of the PKK and work with PKK members at peace conferences and other meetings toward the cause of peace and justice for the Kurds. Further, Plaintiff WTCC has distributed LTTE literature and informational materials throughout the United States to advocate on behalf of the Sri Lankan Tamils' human rights.

23. Each of these activities could be construed as the prohibited provision of "personnel" under the AEDPA. The AEDPA places no limitation on the type of personnel which is prohibited, or whether the use of any human resources in support of a foreign terrorist organization is prohibited. Thus, the term "personnel" broadly encompasses the type of human resources which Plaintiffs seek to provide, including the distribution of LTTE literature and informational materials and working directly with PKK members at peace conferences and other meetings.

24. The AEDPA also contains no limitation on the proscribed "training."

25. In this case, HLP and Judge Fertig have assisted and trained some PKK mem-

8. The AEDPA defines the term "material support or resources" as "currency or other financial securities, financial services, lodging, *training*, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, *personnel*, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b) (emphasis added).

9. Other cases support the finding that the terms "personnel" and "training," similar to language held impermissibly vague in other cases, do not allow a person of ordinary intelligence to know what conduct is prohibited. *See, e.g., Kolender*, 461 U.S. at 357, 103 S.Ct. 1855 (sustaining facial challenge to ordinance requiring loiterers to pro-

vide police with "credible and reliable" identification); *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (finding statute barring "treat[ing] contemptuously the flag of the United States" void for vagueness); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (invalidating vagrancy ordinance which permitted police to arrest a person for being a "common thief"); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 95, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965) (invalidating statute permitting police to arrest loiterer for not obeying officer's request to "move on"); *Lanzetta v. New Jersey*, 306 U.S. 451, 458, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (invalidating statute which made it illegal to be a "gangster").

bers in using humanitarian law and international human rights law and in seeking a peaceful resolution of the conflict in Turkey. HLP and Judge Fertig would also like to train the PKK in how to engage in political advocacy and on how to use international law to seek redress for human rights violations.

26. The AEDPA broadly prohibits all "training" without express limitation. *See* 18 U.S.C. § 2339A(b). It does not prohibit only training on how to use weapons, build bombs, or raise funds. Thus, the AEDPA criminalizes some of the activities in which Plaintiffs have engaged and would like to engage.

27. The AEDPA's scienter requirement, *see* 18 U.S.C. § 2339B(a)(1) ("whoever ... *knowingly* provides material support ...") (emphasis added), does not mitigate the Court's conclusion that the AEDPA is impermissibly vague.

28. The Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *See Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. 1186. In this case, however, the scienter requirement does not mitigate a finding of vagueness. It is undisputed that the Plaintiffs have provided and seek to continue to "knowingly" provide personnel and training. The AEDPA does not, however, appear to allow persons of ordinary intelligence to determine what type of training or provision of personnel is prohibited. *See Foti*, at 638. Rather, the AEDPA appears to prohibit activity protected by the First Amendment—distributing literature and information and training others to engage in advocacy. Thus, the AEDPA's scienter requirement does not mitigate a finding of vagueness.

29. For all these reasons, Plaintiffs have demonstrated a probability of success on the merits of their claim that the terms "personnel" and "training" are impermissibly vague.

30. Because Plaintiffs have demonstrated a probability of success on their claim that the terms "personnel" and "training" are vague, they have necessarily established irreparable injury. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see Jacobsen v. United States Postal Serv.*, 812 F.2d 1151, 1154 (9th Cir.1987). Accordingly, Plaintiffs are entitled to a preliminary injunction.

31. Any findings of fact deemed to be conclusions of law are incorporated herein by reference.

### *ORDER*

IT IS HEREBY ORDERED:

1. That Defendants JANET RENO, as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, MADELEINE ALBRIGHT, as United States Secretary of State, and UNITED STATES DEPARTMENT OF STATE, their officers, directors, principals, agents, servants, employees, and successors, and all those acting in concert or participation with them, are preliminarily enjoined from:

enforcing Section 303 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996), codified at 18 U.S.C. § 2339B, against RALPH FERTIG and NAGALINGAM JEYALINGAM, or against HUMANITARIAN LAW PROJECT, ILANKAI THAMIL SANGAM, TAMILS OF NORTHERN CALIFORNIA, TAMIL WELFARE AND HUMAN RIGHTS COMMITTEE, FEDERATION OF TAMIL SANGAMS OF NORTH AMERICA, and WORLD TAMIL COORDINATING COMMITTEE and any of their members, for providing "personnel" or "training" to either the Kurdistan Workers' Party, a.k.a. Partiya Karkeran Kurdistan, a.k.a. PKK or the Liberation Tigers of Tamil Eelam, a.k.a. LTTE, a.k.a. Tamil Tigers, a.k.a. Ellalan Force.

2. The bond requirement under Rule 65 of the Federal Rules of Civil Procedure shall be waived because the defendants are unlikely to suffer any monetary damages from the issuance of this preliminary injunction.